## Case No. 11,716.

### The REVERE.

[2 Spr. 107; [1] 24 Law Rep. 276.]

District Court, D. Massachusetts.   Feb., 1862.[2]

PRIZE—LIBEL — ANSWER — BLOCKADE—MISREPRESENTATIONS—WARNING—SOVEREIGN AND BELLIGERENT RIGHTS.

1. In prize cases the libel need not set forth specifically the grounds on which condemnation is sought.

2. An answer in the nature of pleading is irregular; and where a simple claim is filed, and the claimant annexes thereto his answer as a "test affidavit," so much of the document called a "test affidavit" as goes beyond the facts of the claim, is not to be regarded.

3. The facts in the case show that the port of Beaufort, N. C., was effectively blockaded on the 6th September, 1861.

4. Persistent misrepresentation by the claimant of the character and destination of the voyage of the captured vessel, is sufficient cause for condemnation of the vessel and cargo.

5. It seems that by the true construction of the proclamation of the president of April 19, 1861 [12 Stat. 1258]. only those who are ignorant of the blockade are entitled to the warning and endorsement mentioned in the proclamation.

6. As against the rebels, the United States has both sovereign and belligerent rights. In establishing the blockade, it has exercised only belligerent rights. As a sovereign, it might, by a municipal regulation, have interdicted all commerce with ports in the states of the insurgents.

This was a cause of prize. The libel simply alleged the vessel to be a prize, taken by the United States ships of war Susquehanna and Cambridge, with the names of the parties interested as captors, that the vessel was within the jurisdiction of the court, and prayed her condemnation. The vessel's papers were filed in court, and the master, chief mate, and cook were examined on the standing interrogatories. The counsel for the claimant first filed an answer, in the manner of instance causes, sworn to by the claimant, going into all the facts of defence or excuse. This was objected to by the counsel for the captors, and a simple claim was filed, and the claimant annexed his answer as a "test affidavit." The claimant's counsel moved that the libel be dismissed as insufficient, as it set forth no cause for capture or condemnation; and the counsel for the captors objected to the "test affidavit" as inadmissible, because it went into facts not open on a hearing in preparatory. On these motions a hearing was had.

R. H. Dana, Jr., U. S. Atty., for the captors.

1. The libel is not only sufficient, but is the proper form for all prize proceedings, and departures from this form are irregular. Append. 2 Wheat. [15 U. S.] 19; The Adeline, 9 Cranch [13 U. S.] 283–285; The Fortuna, 1

---

[1] [Reported by Hon. Richard H. Dana, Jr., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported.]

Dod. 82: The Ostsee, 9 Moore, P. C. 150; The Gerasimo, 11 Moore, P. C. 88, 115; 3 Phillim. Int. Law, 589.

2. In prize causes an answer is irregular, and whether in that form or in the form of a test affidavit. Nothing in the nature of pleadings or proofs offered by litigant parties is admissible in this stage of the cause. Append. 1 Wheat. [14 U. S.] 500, 501; The Port Mary, 3 C. Rob. Adm. 233; The Aina, 1 Spinks, 313, 28 Eng. Law & Eq. 600; The Abo, 1 Spinks, 347, 29 Eng. Law & Eq. 591; The Ostsee, 9 Moore, P. C. 150, 33 Eng. Law & Eq. 28; The Ida, 1 Spinks, 331, 29 Eng. Law & Eq. 574; The Amiable Isabella, 6 Wheat. [19 U. S.] 1; The Dos Hermanos, 2 Wheat. [15 U. S.] 76; The Ann Green [Case No. 414]; The Liverpool Packet [Id. 8,406]; The Rapid [Id. 11,576]; Marr. Form. 209, 211; Append. 1 Wheat. [14 U. S.] 498, 499; 3 Phillim. Int. Law, 583.

C. L. Woodbury, for claimant, cited, in support of the answer and affidavit, and against the libel, The Beurse Van Koningsberg, 2 C. Rob. Adm. 170, and the cases of The Lively [Case No. 8,403], and The Rapid, from the Prize Records of this district in 1812–14 (volume 1, pp. 550, 623), and the 27th admiralty rule.

SPRAGUE, District Judge. The libel need not set forth specifically the grounds on which condemnation is sought. General allegations are sufficient. Prize proceedings are not subject to the same rules of pleading as suits on the instance side of the court. This hearing is upon the preparatory evidence, as it is called; that is, upon the papers found on board the vessel, and the answers of her officers and crew upon the standing interrogatories. Claimants are not entitled to further proof, nor are captors, except in special cases, upon motion and cause shown. The answer, in the nature of pleading, is therefore irregular; and so much of the document called a test affidavit as goes beyond the facts of the claim is not to be regarded.

The hearing then proceeded upon the merits. The vessel was English property, sailing from Halifax, Nova Scotia, and captured off Beaufort, N. C.

Mr. Dana, for captors.

1. The blockade of Beaufort, N. C., was established by the president by proclamation of April 27, 1861 (12 Stat. Append. Acts 1861, p. iii.), and Commodore Pendergrast's proclamation of April 30, 1861, declared it effective; and the evidence shows it was effective at the time of the capture, and known to be so by the prize before she sailed from Halifax, and notified to her by the United States ship Preble only two days before she reached the port. It has been legalized by congress, if that were requisite. Act Aug. 6, 1861, c. 63, § 3 (12 Stat. 326). The validity of a blockade of our own ports, in case of insurrection, as against neutrals, has been established by judicial decisions. The Tropic Wind (D. C.; June, 1861) [Case No. 14,186], by Dunlop, J.; The Hiawatha [Id. 6,451]; The Hallie Jackson [Id. 5,961], and The North Carolina [Id. 10,316a], by Betts, J.; The Parkhill (Eastern Dist. Pa.; July, 1861) [Id. 10,755a], by Cadwallader, J.; and U. S. v. The F. W. Johnson (Md.; Sept., 1861) [Id. 15,179], by Giles, J. That the sovereign may exercise belligerent powers, as well as the powers of municipal sovereignty, in case of civil war having its origin in insurrection, is established by these cases, and in other cases previously decided. Martin v. Mott, 12 Wheat. [25 U. S.] 29; Rose v. Himely, 4 Cranch [8 U. S.] 272, 273; The Santissima Trinidad, 7 Wheat. [20 U. S.] 305; Cheriot v. Foussat, 3 Bin. 252; Dobree v. Napier, 3 Scott, 202, 2 Bing. N. C. 781.

2. The claim must be dismissed because the vessel sailed with false papers, for the purpose of deception; because she wilfully deceived the United States ship Preble, as to her destination. and because of the falsity of the claim put in, and the false testimony given, all with an intent to mislead the court. These are sufficient grounds for dismissing the claim, and even for condemnation. The Ebenezer, 6 C. Rob. Adm. 250; The Eenron, 2 C. Rob. Adm. 1; The Juffrouw Anna, 1 C. Rob. Adm. 126; The Carolina, 3 C. Rob. Adm. 76; The Phœnix, Id. 186; The America, Id. 36; The Franklin, Id. 217; The Neutralitet, Id. 296; The Vrouw Hermina, 1 C. Rob. Adm. 165; The Welvaart, Id. 124; The Concordia, Id. 119; The Neptunus, 3 C. Rob. Adm. 80; The Nancy, Id. 122; The Vrow Anna Catharina, 5 C. Rob. Adm. 16, 161; The Graaff Bernstorf, 3 C. Rob. Adm. 109; The Jenny, 4 C. Rob. Adm. 31; The Mars, 6 C. Rob. Adm. 79; The Vigilantia, Id. 122; The Sally [Case No. 12,258]; The Liverpool Packet [Id. 8,406]; The Alexander [Id. 164]; The Lively [Id. 8,403]; The Diana [Id. 3,876]; The Flying Fish [Id. 4,892]; The St. Nicholas, 1 Wheat. [14 U. S.] 431; The Fortuna, 3 Wheat. [16 U. S.] 244; The Dos Hermanos, 2 Wheat. [15 U. S.] 76; The Amiable Isabella, 6 Wheat. [19 U. S.] 1; The San Jose Indiano [Case No. 12.323]; The Ida, 1 Spinks, 331, 29 Eng. Law & Eq. 574; 1 Wheat. Append. 505.

3. This vessel had recent and authentic information that her port of destination. Beaufort, N. C., was under effective blockade, established by competent authority, and intended to be permanent. This she had, not only at Halifax when she sailed, but from the United States ship Preble, off the coast of North Carolina. Under such circumstances, she had no right, by the law of nations, to sail directly for, and seek to enter, the blockaded port. and claim formal notice and warning at the very port. The Spes & The Irene, 5 C. Rob. Adm. 77–81; The Betsey, 1 C. Rob. Adm. 334; The Arthur, Edw. Adm. 203; The

Columbia, 1 C. Rob. Adm. 154–156; The Apollo, 5 C. Rob. Adm. 286–289; 3 Phillim. Int. Law, 397, 398.

4. A vessel so found, with such knowledge, is to be condemned, unless she accounts for her position by clear proof, free from all concealment or bad faith in documents or in acts. The Neutralitet, 6 C. Rob. Adm. 35; The Charlotte Christine, Id. 101; The Gute Erwartung, Id. 182; The Panaghia Rhomba, 12 Moore, P. C. 168.

5. It is immaterial, in a case like this, how the vessel acquired her knowledge, and whether the blockade be de facto only, or also directed by proclamation from the supreme power. The Mercurius, 1 C. Rob. Adm. 82; The Rolla, 6 C. Rob. Adm. 364; The Franciska, 10 Moore, P. C. 58; 3 Phillim. Int. Law, 384.

Mr. Woodbury, for claimant.

1. So far as relates to the ports of North Carolina, the proclamations of the president and of Commodore Pendergrast only show an intention to create a blockade of those ports. In fact, no blockade was established after said proclamation and before the sailing of the Revere on this voyage. The proclamations only show a paper blockade; there is no evidence of an actual blockade. The Betsey, 1 C. Rob. Adm. 93; The Henrick & Maria, Id. 146; The Mercurius, Id. 82; The Neptunus, Id. 171; The Juffrow Maria Schroeder, 3 C. Rob. Adm. 156; The Nancy, 1 Act. 57.

2. According to the law of nations, as understood by the United States government, not merely a proclamation, but an actual warning to vessels approaching a blockading port, must be given. The president's proclamation of 19th April declares that "if, with a view to violate such blockade, a vessel shall approach either of the said ports, she will be duly warned," &c., and provides for capture only in case of a renewed attempt. Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 199. Treaty with Great Britain, 1794, art. 18; with Prussia, 1828, art. 13; and treaties with fourteen other powers were referred to by counsel. "Diplomatic Correspondence of the United States," 1 Elliot, Dip. Code, 529, 530, note; 3 Am. St. P. tit. "Foreign Relations," pp. 149, 155, 170. The notice must be of the specific port, and must be of an existing fact, and not of probabilities or intentions. See cases cited under the first point. The "warning" in the proclamation is a technical term, and requires notice at the port by the blockading force. Maryland Ins. Co. v. Woods, 6 Cranch [10 U. S.] 49; Medeiros v. Hill, 8 Bing. 231.

3. The pretended notice by the Preble was not in conformity to the American law. It was not "near the blockaded port," nor "endorsed on her register," as required by the proclamation. Nor did it relate to the port of Beaufort. No vessel, but one actually investing Beaufort, was competent to warn the Revere. There is no evidence that she at-tempted to violate the blockade after its existence was known to her.

Mr. Dana, in reply.

It is to be presumed that a belligerent does not intend to diminish the powers the law of nations gives him. The proclamation of blockade of North Carolina, April 27, makes no reference to "warning." If it must be held to adopt that of April 19, the true construction is that a vessel about to violate the blockade, in ignorance of it, shall have warning and endorsement on her register. The United States has never claimed that a vessel affected with recent and authentic knowledge is entitled, or shall be so by treaty, to go to the very port for a formal warning. 1 Kent, Comm. 149, 153; Yeaton v. Fry, 5 Cranch [9 U. S.] 341; Maryland Ins. Co. v. Woods, 6 Cranch [10 U. S.] 48; Radcliff v. United Ins. Co., 7 Johns. 47; Fitzsimmons v. Newport Ins. Co., 4 Cranch [8 U. S.] 185. A blockade once effectually established by the supreme powers, and notified by proclamation, must be presumed by the neutral to continue. The Neptunus, 1 C. Rob. Adm. 171; 3 Phillim. Int. Law, 385. The British treaty of 1794 (expired) applied only to vessels sailing without knowledge. 8 Stat. 126. See The Columbia, 1 C. Rob. Adm. 154; The Shepherdess, 5 C. Rob. Adm. 262; The Betsey, 1 C. Rob. Adm. 334. The Prussian treaty was put on the ground of the remoteness of the two countries, which at the time rendered recent and authentic information impossible. But this vessel, having used papers giving a false destination, when boarded by the Preble, and given a false account, and so prevented a formal warning being given to her by that ship, cannot set up the want of warning.

SPRAGUE, District Judge. This vessel, with a cargo of fish and salt, was, on the tenth day of September last, captured by the United States ships of war Cambridge and Susquehanna, as she was attempting to enter the harbor of Beaufort, in the state of North Carolina, and sent to this port for adjudication. The claimant is a British subject, residing at Yarmouth, N. S., and is the owner of the vessel and cargo. In this, the first prize suit which has come before me, I have derived great aid from the able arguments and thorough investigations of the learned counsel.

The counsel on both sides have referred to, and relied upon, the proclamations of the president of the United States of the 19th and 27th of April last, and of Commodore Pendergrast of the 30th of the same month. The ground upon which the captors ask for condemnation, is, the violation, or attempted violation, of blockade. The existence of the war, and the authority of the president and naval commanders to institute a blockade of Beaufort and other ports of North Carolina, are not controverted; but it is insisted, by the counsel for the claimant, in the first place,

that no blockade was actually established; and, secondly, that, if there was, this vessel had not been warned in the manner prescribed by the president's proclamation of the 19th of April. The first question, then, is, was there an effective blockade of the port of Beaufort at the time of this capture.

The president, in his proclamation of the 19th of April, announced that there would be a blockade, by a competent force, of the ports of the states therein mentioned. And, by the subsequent proclamation of the 27th of April, it was declared that an efficient blockade of the ports of Virginia and North Carolina would also be established. The proclamation by Commodore Pendergrast, of the 30th of April, dated off Fortress Monroe, warned all persons interested that he had a sufficient naval force there for the purpose of carrying out the president's proclamation of the 27th of April.

Notwithstanding these proclamations, it appears that this vessel subsequently made a voyage from Yarmouth, N. S., to Beaufort, N. C., where she arrived some time in June, with a cargo of fish. She there took on board a cargo of turpentine, and sailed on her return voyage; and, soon after leaving Beaufort, was boarded by the United States gunboat Daylight, the captain of which said to the master of the Revere, as the latter deposes, "You are all right this time, and I have no authority to stop you: there's no blockade. . . . I suppose there will be a blockade along here by and by." If we take into view other parts of the master's testimony, we must doubt the accuracy of his report of this conversation. But the fact that such a voyage was made goes far to show that Commodore Pendergrast had not then made such disposition of his force as to constitute an efficient blockade of the port of Beaufort; but the declaration of the captain of the Daylight was, at least, an admonition as to a future voyage. The Revere proceeded to Halifax, there loaded with fish and salt, and, about the 24th of August, sailed on the voyage in which she was captured.

The communication, by mail and telegraph, between the United States and Halifax, was regular and rapid. The first mate, in answer to the 21st interrogatory, says, "I had heard, and I suppose the master must have heard, that the port of Beaufort was blockaded,—I heard of it in Halifax,—and that the blockade was effective. After leaving Halifax, I discussed it with the master, and he told me he had word from the owner to go to Beaufort and see if it was blockaded." And, in answer to the 22d interrogatory, he says, "I knew the port of Beaufort was blockaded, as I saw it in the papers at Halifax." That the owner and master had reason to believe that Beaufort was blockaded, is also shown by the false destination held out by the ship's papers. The clearance, manifest, and shipping articles declare the voyage to be from Halifax to Key West; and yet the

actual voyage, intended and prosecuted, was direct from Halifax to Beaufort. Of this there can be no doubt. Three depositions have been taken,—those of the master, the mate, and cook. All state that the Revere went directly from Halifax to Beaufort, and was attempting to enter that port.

This fact is not, indeed, disclosed in the first instance; for, in answer to the earlier interrogatories, they say that the vessel was bound for Key West. By this they must have meant that such was her ostensible or paper destination. For, subsequently, in answer to more pointed interrogatories, they all declare that the first port that this vessel attempted to enter was Beaufort, and was prevented by seeing the Susquehanna there; upon which she put about, and was soon afterwards intercepted by the Cambridge, the Susquehanna being in sight. Even the master's deposition will be found, in the latter part, to clearly admit this, in answer to the more searching interrogatories, although, in the earlier part of his deposition, he manifests a disposition to mislead. And there is, in many parts, a disingenuousness which impairs his credit.

Besides this testimony, the letter of instructions from the owner to the master also points to a direct voyage to Beaufort. It begins by saying, "You will proceed to Key West. On your passage down you may call off Beaufort, and, if the port is not blocked, you may go in." Here, in the form of a permission, it is distinctly enunciated that his first port was to be Beaufort, and, if he could not enter there, the letter proceeds to say, that he may, if he thinks proper, return to Alexandria, sell his cargo, and get a load of corn; in which case he is instructed in what manner to obtain funds. The letter, at last, says, "If you go to Key West, you must do the best you can as regards back freight;" &c. From this it is clearly to be inferred, that the master was first to go to Beaufort, and, if he could not enter there, to proceed next to Alexandria if practicable, and only in the last resort to go to Key West. Instructions were given as to obtaining a return cargo in case he should go to Alexandria or Key West, but none if he went to Beaufort. The owner himself, as well as the master, had been at that place in the preceding voyage, and probably then made arrangements with consignees for another voyage.

That the master understood his orders to be to go direct to Beaufort, is apparent from his declaration to his mate after leaving Halifax. Beside this, there is a pregnant statement made by the master as to his interest. He at first says, if he had made the voyage, he was, in addition to his wages, to have one-eighth of the vessel; and afterwards he says, if he made a successful voyage, he was to have one-eighth of her. Now why this extraordinary contingent compensation, unless for some extraordinary service? If the actual destination was to Key West, as represented

by the papers, there could be nothing calling for the stimulus of so great a reward, and no profits could be anticipated which would warrant it. But if he should run a blockade both in and out, the skill, hazard, and profits might well warrant this extraordinary incentive and reward.

I have adverted to this evidence of a false and deceptive destination, merely as proof that the owner had such information and apprehension of a blockade as induced him to resort to these false representations, for the purpose of deceiving the cruisers of the United States. I shall have occasion to return to this deception hereafter for another purpose.

On her passage from Halifax to Beaufort, the Revere was overhauled by the United States ship of war Preble. This was off Cape Hatteras, and, as the mate says, two days before the capture.

The master says it was about sixty miles east of Hatteras, "and something like three days" before the capture. The logbook has not been found or accounted for. The mate is the more reliable witness. The officer of the Preble examined the Revere's papers; and the master says that the officer asked him if he was going into any of the places along there, to which he replied that he was going to Key West; that the officer told him that he could not go into any of the ports near there. The mate testifies that the officer "told us the news, and that there was a blockade all along." The Revere was permitted to proceed, and continued her voyage direct for Beaufort. When nearing that port, for the purpose of entering it, she saw the Susquehanna about three miles off, and immediately put about to avoid her. About an hour afterwards, as the mate says, she was met and captured by the Cambridge, the Susquehanna being still in sight. The mate expressly says that the port was blockaded, and all agree that the ground of capture and detention was an attempted infraction of a blockade. I cannot doubt that there was, at that time, an actual and efficient blockade of the port of Beaufort. How long it had existed cannot certainly be determined. There is reason to believe that it was some time before this vessel left Halifax. But the force actually found before the port, and the notice given by the Preble, are satisfactory evidence that the blockade existed at the time the Revere was overhauled and examined.

The second ground of defence relied upon, is, that this vessel had no warning endorsed upon her register, as set forth in the president's proclamation of the 19th of April.

The counsel for the captors has remarked, that the proclamation of the 27th says nothing of any warning. I do not think it necessary to consider the question raised by that suggestion, but shall examine the question upon the assumption that the ports of North Carolina are placed in the same condition as the ports of the states named in the prior proclamation. It is insisted by the counsel for the

claimants, that, if a blockade actually existed, and this was known to the master and owner before the vessel left Halifax, still she had a right to proceed to Beaufort, and was entitled to have a warning endorsed upon her register by a ship of war, and was not subject to capture unless she attempted to enter the port after such endorsement.

In support of this proposition, an argument of much force has been presented from the language of the proclamation and the decision of the supreme court in Maryland Ins. Co. v. Woods, 6 Cranch [10 U. S.] 29, and other authorities cited by the counsel for the claimants. On the other hand, it is contended, that, by the true construction of the proclamation, only those who are ignorant of the blockade are entitled to the warning and endorsement. And that it is not to be presumed that a belligerent would gratuitously narrow his own rights to his own injury; that, by the law of nations, this vessel had such information and notice as to preclude her from the right to inquire at the port and attempt to enter.

This view is strengthened by the earlier part of the proclamation, which declares that a blockade is set on foot in pursuance of the law of nations. The notice given to the world by Commodore Pendergrast, evidently gives to the proclamation the construction contended for by the captors. After referring to the proclamation, and stating that he had sufficient force for carrying it into effect, he says, "All vessels passing the capes of Virginia, coming from a distance, and ignorant of the proclamation, will be warned off." The world thus had notice that those only were to be warned who were ignorant. This question of a necessity of a warning and endorsement came before the eminent admiralty judge in the Southern district of New York, in the case of The Hiawatha [Case No. 6,450], which had left the port of Richmond, and he held that previous knowledge of the blockade dispensed with the necessity of a warning. In the case of The Hallie Jackson [Id. 5,961], which was attempting to enter a blockaded port, the same learned judge, according to a newspaper report, said she was not entitled to be warned off, "if approaching with intent to violate the blockade." These and other citations, made by the learned counsel for the captors, are weighty authorities. But I do not think that it is necessary to decide this question, because, in the case now before me, there is an element which has not been adverted to by the counsel for the claimants.

He has contended, that, under the proclamation, the Revere, with information of the existence of the blockade, had a right to sail directly from Halifax to this port, and to enter it, if not there warned off in the manner set forth in the proclamation; and that, until such warning, the vessel was not liable to capture for an attempt to enter.

Now, if a neutral can in any case claim this great indulgence, it can only be when

he has conducted with fairness. He certainly cannot be entitled to it when he has deliberately presented a false destination upon all the ship's documents for the purpose of deceiving belligerent cruisers.

Deceptive practices, on the part of neutrals, are animadverted upon, and penal consequences denounced, in the numerous cases cited by the learned counsel for the captors. Thus, if a neutral owner of a ship, or a part of a cargo, endeavors to cover enemies' property, he forfeits his own as a penalty. The Eenrom, 2 C. Rob. Adm. 1; The Graaff Bernstorf, 3 C. Rob. Adm. 110; The Dos Hermanos, 2 Wheat. [15 U. S.] 76.

A false destination always weighs against a neutral, and is oftentimes fatal. If the real voyage be of doubtful legality, and one to be carefully watched, a false destination is sufficient ground for condemnation.

In The Ebenezer, 6 C. Rob. Adm. 250, a neutral ship appeared by her papers to have been bound from Bordeaux to Embden, and then to have entered upon a new voyage to Antwerp. Sir William Scott thought that the voyage was substantially one from Bordeaux to Antwerp, and that the destination to Embden was held out for the purpose of deception; and he condemned the vessel and cargo solely on that ground. He did not deny the right of the neutral to go directly and avowedly from Bordeaux to Antwerp, but placed the condemnation on the ground of the false representation by the papers.

On page 256, he uses this language: "It is said that there has been no fraud practised; that the parties were doing no more than they might have done in a direct way. But is it no fraud? Is it not rather a double fraud, to represent the voyage from Bordeaux to have been to Embden, and the voyage to Antwerp to have been from a neutral port? Is the holding out Embden as one of the terms of each voyage nothing to lull to sleep the suspicions of British cruisers? And when I say suspicions, I mean legal suspicions, as to the presumption of enemies' property and the rules under which that presumption would become a subject of more rigorous investigation. Deceit was practised as to the destination, and, I must think, a fraudulent deceit, for the express purpose of evading the jealousy and vigilance with which a direct destination in such a trade would have been considered. I shall therefore reject this claim."

In The Carolina, 3 C. Rob. Adm. 75, a neutral shipped goods from Bayonne ostensibly to Altona, but really for Ostend. Sir William Scott refused to permit the shipper to go into evidence of his neutral character, by further proof, because of this false destination, and the property was condemned. The decision was not placed upon the ground that a direct voyage from Bayonne to Ostend was illegal. On page 77, he says: "Had there been any fair, contingent, deliberative intention of going to Ostend, that ought to have appeared on the bills of lading. For it ought

not to be an absolute destination to Hamburgh, if it was at all a question whether the ship might not go to Ostend, a port of the enemy. There is, then, an undue and fraudulent concealment of an important circumstance which ought to have been disclosed."

The Phœnix, 3 C. Rob. Adm. 186, is a case of false destination and condemnation for that reason. So also The Star, an American vessel, mentioned in the note, page 193. The following are also cases of false destinations: The America, Id. 36; The Franklin, Id. 217. There are several other cases cited by the learned counsel, for the captors, where the same doctrine is adverted to.

This vessel, as we have seen, sailed directly from Halifax for a blockaded port; a voyage not only to be closely watched, but to be intercepted and prevented by our ships of war.

The master and owner, having not only previous notice that a blockade was intended, but information that it had been actually established, inserted in all the vessel's documents the false declaration that the voyage was to Key West; and this was done for the fraudulent purpose of deceiving belligerent cruisers.

Nor is this all. That intended deception was actually consummated. When off Hatteras, this vessel was overhauled by the United States ship-of-war Preble. An officer was sent on board, who examined the papers, and questioned the master as to the destination. All declared that she was bound to Key West; and thereupon the officer, after giving the master express notice that he could not go into any of the ports along there, permitted her to proceed. Now, if the officer of the Preble had known the actual destination of this vessel, it would have been his duty to take effectual measures to prevent her reaching it; and it is to be presumed that he would have done so either by a formal warning and endorsement at the proper place, or by other effective means. This he omitted to do, and, deceived by false representations, written and verbal, permitted her to go on her way unaccompanied and unpursued; and thereupon she continued her voyage direct for Beaufort, was captured in attempting to enter that port; and the owner now sets up the want of a formal warning as a defence. He thus asks the court to give him the fruits of his fraud and deception. His claim filed in this suit states that the Revere "cleared and sailed for Key West, on which voyage she was captured." Thus persistent has the claimant been in misrepresenting the destination and character of this voyage.

To avoid misapprehension, I would remark, that, as against the rebels, the United States has both sovereign and belligerent rights. In establishing the blockade, it has exercised only the latter, and I have dealt with the case before me accordingly. As a sovereign, it might, by a municipal regulation, have in-

terdicted all commerce with ports in the states of the insurgents.

The vessel and cargo must be condemned.

On appeal to the circuit court, the judgment in this case was affirmed. [Case unreported.] See, also, The Admiral, 3 Wall. [70 U. S.] 603; The Josephine, Id. 83; The Cheshire, Id. 231; The Sir Wm. Peel, 5 Wall. [72 U. S.] 517.